UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

WENDY F. SHAW,

                Plaintiff,

    v.

TOWN OF PORTER,

                Defendant.

_____

**19-CV-311-JLS-HBS**

**Report & Recommendation**

    This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b). Dkt. No. 3. Self-represented plaintiff Wendy F. Shaw brings suit against her employer, defendant Town of Porter, for sex discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Currently before the Court is the Town's motion for summary judgment. Dkt. No. 11. Shaw opposes the motion, Dkt. No. 13, and the Town has filed its reply. Dkt. No. 15. The matter is therefore fully briefed.

    For the reasons that follow, the Court recommends that the Town's motion for summary judgment be GRANTED, and that the complaint be DISMISSED.

## LEGAL STANDARD

    "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). In addition, "summary judgment will not lie if the dispute about a material fact is 'genuine,'

that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

## BACKGROUND

The following facts are taken from the record. In April 2012, the Town hired Shaw as a truck driver. Dkt. No. 13 at 22. The Town uses a salary scale for employees, whereby employees are placed at a pay grade and receive yearly "step" pay increases, up to step 5. *Id.* at 17-18, 22. As a truck driver, Shaw was placed at step 1 of pay grade "4.5."

The parties agree that, despite being classified as a truck driver, Shaw was actually "performing the duties of Motor Equipment Operator." Dkt. No. 15 at 1. The latter position starts at a higher pay grade—step one of paygrade 5. Dkt. No. 11-7 at 11. In January 2013, nine months after Shaw was hired, the Town promoted her to the Motor Equipment Operator position and step 1 of paygrade 5. Shaw has remained in that job to the present. *Id.* at 15.

The crux of Shaw's sex discrimination claim is her allegation the Town initially placed her in the lower-paygrade "truck driver" position due to her sex. *See* Dkt. No. 11-7 at 23. That initial classification caused her damages because she fell behind on the yearly step increases she would have received at paygrade 5 as a Motor Equipment Operator.

Shaw infers that the Town discriminated against her from several facts. In the first place, the circumstances of her initial hiring were unusual. Shaw alleges that the truck driver position was created for her and that she was "the first person in the history of the Town" to be hired as a truck driver but required to perform the duties of a Motor Equipment Operator. Dkt. No. 1 at 7. Her supervisor at the time, Scott Hillman, had disagreed with the Town board's decision to create the truck driver position, believing that "hiring somebody as a truck driver was going to cause controversy and they should hire [the person] as" a Motor Equipment Operator. Dkt. No. 11-7 at 13.

Once Shaw learned that she was performing work commensurate with the Motor Equipment Operator position, she requested to be classified as such, *and* she sought an additional step increase to account for the time she was a truck driver. *Id.* at 16, 22. In other words, she sought to be moved to step 2—not step 1—of pay grade 5. Based on the Town's employee handbook, it does not appear that Shaw could claim any entitlement to an additional step increase, but would instead need special dispensation from the Town board. *See* Dkt. No. 13 at 19, 22. The handbook reads:

> Employees covered by the salary schedule . . . will be eligible to advance to the next higher step in the employee's pay grade on the first day of January of each year . . . . The step advance will be granted at the discretion of the Town Board.
>
> *An employee must work a minimum of six months of a given calendar year to be eligible for a step increment.*
>
> An employee hired prior to July 1st of a given year will be eligible for a step increment on the following January 1st. An employee hired on or after July 1st of a given year will be eligible for a step increment on the first day of January after completing one continuous year of employment.

*Id.* at 19 (emphasis added and internal emphasis omitted). Because Shaw had not technically worked as a Motor Equipment Operator for six months in 2012 (though she admittedly performed the same work), she was not entitled to a bonus step increase as of 2013.

Despite this language, one town board member, Joe Fleckenstein, supported Shaw's request for the bonus step increase and assured her it would be granted in January 2013. *See id.* at 11. In January 2013, however, the board approved Shaw's re-classification and pay-grade change, but not the additional step increase. *Id.* at 14. Shaw complained about this to the Mert Wiepert, then the town supervisor. He informed her that she "did not meet the time requirements to advance to the second step," *Id.* at 22, and that the "new hiring practice" in the Highway and Water/Sewer departments would be to start new employees at pay grade 4.5. *Id.* at 7-8.

In Shaw's view, the Town's later actions were inconsistent with this "new hiring practice" Wiepert cited. Specifically, in July 2018, the Town hired another employee, Justin Stoelting, to perform work in the Water/Sewer department. Stoelting performed the same duties as Shaw did, but he started at step 1 of paygrade 5, not 4.5. In addition, the Town board granted Stoelting an extra step increase to begin in January 2019, despite the fact that he had not worked in the position for the six months required by the employee handbook. *See* Dkt. No. 13 at 8. Shaw argues this action was inconsistent with her treatment in 2013. *Id.* at 8, 19.

After learning of Stoelting's treatment, Shaw requested a meeting with the Town board in order to request backpay equal to the amount she should have received had she been hired at paygrade 5 and been granted an additional step increase. Dkt. No. 11-7 at 37-38. This meeting occurred sometime after August 2018. *Id.* at 37. At the meeting, the board informed Shaw that "they

4

were not going to compensate [her] and that they didn't feel Justin should have to wait another year to receive a step raise." *Id.* at 37.

Shaw alleges that, once she requested backpay, she faced retaliation by the Town and current town supervisor John Johnston. Shaw describes several incidents in her materials.

First, at the 2018 meeting where Shaw raised her discrimination concerns, supervisor Johnston accused Shaw of signing her personal emails in a manner that implied she was acting on behalf of the Town's Highway Department. *See* Dkt. No. 13 at 28-29. Shaw explains that, because she had no work email address, she sometimes used her personal email address for work purposes. To that end, Shaw used an email signature block that read:

> Wendy F. Shaw
> Town of Porter Highway

Dkt. No. 11-16 at 2. After learning about the Town's concern, Shaw deleted the reference. Dkt. No. 13 at 9.

Second, in January 2019, supervisor Johnston accused Shaw of falsifying her time sheet to show she was working when she was actually attending a town meeting. *See* Dkt. No. 1 at 7; Dkt. No. 13 at 28-29. Shaw claims the issue arose out of her reasonable misunderstanding of town policy. Both Shaw's immediate supervisor and a town boardmember had informed Shaw she could go to town meetings while on the clock, and Shaw surmises that one of her co-workers must have, without her knowledge, punched her timecard on her behalf. *See* Dkt. No. 13 at 9, 24. When supervisor Johnston informed Shaw she could not do this, she "immediately revise[d] [her] time and used [her] own time to attend." *Id.* at 24.

Third, in February 2019, the Town accused her of misusing bereavement leave. Dkt. No. 13 at 30. Shaw states that this alleged "misuse" was not her fault. When she took time off due to the death of her boyfriend's father, she requested to use personal leave. *Id.* at 25. Her immediate supervisor gave Shaw bereavement leave instead, which the supervisor and Shaw later learned did not apply under the circumstances. Dkt. No. 13 at 25; *see also* Dkt. No. 11-19 at 2 (listing types of family members for whom bereavement leave may be taken). Shaw offered to use her personal time in lieu of bereavement leave, but the Town ultimately took no action. *See* Dkt. No. 11-11 at 5.

Fourth, Shaw alleges that town supervisor Johnston tried to poison her work environment by informing some of her co-workers that they were "named" in her lawsuit.[1] Dkt. No. 13 at 30.

On December 3, 2018—in the midst of these allegedly retaliatory actions—Shaw filed a sex-discrimination charge with the EEOC. Dkt. No. 1. On December 12, 2018, the EEOC dismissed the charge and gave Shaw notice of her right to sue. Dkt. No. 1 at 10.

---

[1] Shaw describes several other allegedly retaliatory incidents that do not merit extended analysis.:

Without further detail, Shaw claims that supervisor Johnston has "repeatedly and maliciously spoken about [her] lawsuit and [her] character" to others in the community. Dkt. No. 13 at 30. The Court disregards this allegation, as Shaw does not explain how she learned of supervisor Johnston's comments. Presumably, she heard about it from others in the community, in which case it would be hearsay. *See Howley v. Town of Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) (statements by co-workers—who alleged that supervisor had spread rumors about employee—could not be used to prove that the supervisor "actually made such statements").

Shaw also claims that supervisor Johnston unsuccessfully tried to compel Shaw's immediate supervisor to write her up for "an incident at the Highway shop." Dkt. No. 13 at 30. The Court declines to address this vague, conclusory allegation.

Finally, in her complaint, Shaw states that in August 2018, a co-worker had been selected to participate in a healthcare committee, despite her request to be on the committee. Shaw does not expressly claim this constituted retaliation, but, even if she did, there is no evidence it was the result of a retaliatory motive. Supervisor Johnston's unrebutted claim is that Shaw could not serve on the committee because "she had previously served on the committee" and representatives are chosen so as to "allow everyone an opportunity to participate." Dkt. No. 11-11 at 5.

6

Shaw filed the present action in March 2019. Her claims can be delineated as follows:

(1) A claim for sex discrimination based on her initial classification at pay grade 4.5 and based on the Town's refusal to grant her an extra step increase in 2013; and

(2) A claim for retaliation based on the Town's and supervisor Johnston's actions after she complained about her disparate treatment.

## DISCUSSION

The Town argues that summary judgment is appropriate on both of Shaw's claims. The Court examines each claim in turn.

### I. Sex Discrimination Related to Pay Practices

Shaw's sex discrimination claim encompasses two pay discrepancies: her initial placement at pay grade 4.5 (as opposed to 5) and the board's decision to deny her an extra step increase in 2013.

"Title VII makes it unlawful for an employer to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment," because of the individual's sex. *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 426 (S.D.N.Y. 2014) (internal quotation marks omitted). It is "often difficult to obtain direct evidence of discriminatory intent," and so the Court employs the *McDonnell Douglas* burden-shifting framework to "progressively sharpen the inquiry into the elusive factual question of intentional discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (internal brackets omitted); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under that framework, a plaintiff first must establish a *prima facie* case of sex discrimination. *See McDonnell Douglas*, 411 U.S. at 802. If she does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the disputed conduct or action. *Id.* If the defendant

7

proffers such a reason, the presumption of discrimination created by the *prima facie* case drops out of the analysis, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). That is, Shaw must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [Town] were false, and that more likely than not discrimination . . . was the real reason for the employment action." *DeMuth v. U.S. Small Bus. Admin.*, 819 F. App'x 23, 25 (2d Cir. 2020) (summary order).

Here, the Court may assume Shaw can demonstrate a *prima facie* case of discrimination. Turning to the second step of the *McDonnell Douglas* framework, the Town must provide, and in this case has provided, legitimate, non-discriminatory reasons for its compensation decisions.

As to the decision to place Shaw at pay grade 4.5, town supervisor Johnston avers that "[a]t the time of [Shaw's] hire, there was no position open in the budget for a motor equipment operator. She was hired mid-year in April, 2012. Once the budget was put in place for the calendar year 2013, a motor equipment operator position opened up for her and she received a salary increase. This took effect in January, 2013." Dkt. No. 11-11 at 3. In other words, the Town placed Shaw at pay grade 4.5 because of budgetary constraints, not her sex. This is a legitimate reason for Shaw's treatment. *See Mansfield v. Billington*, 574 F. Supp. 2d 69, 81 (D.D.C. 2008) (collecting cases and concluding that the employer's "budgetary constraints satisfies its burden to proffer a legitimate non-discriminatory reason for denying the plaintiff a pay increase").

As to the step increase, Shaw had no entitlement to an additional step increase because, per the employee handbook, she had not worked as a Motor Equipment Operator long enough. That

was a permissible reason to deny Shaw's request. *See Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir. 1980) (stating that an employer meets its burden when it brings forth evidence that it "acted on a neutral basis"). Although the board later exercised its discretion to give Stoelting an extra step increase, Johnston avers that the Town approved his step increase because of the equities of Stoelting's situation—*i.e.*, the fact that Stoelting was supposed to be hired before, but was ultimately hired only one week after, the cutoff date for the bonus step increase permitted under the employee handbook. *See* Dkt. No. 11-11 at 4; Dkt. No. 13 at 19 (stating that an employee hired prior to July 1st of a given year "will be eligible for a step increment on the following January 1st"). On its face, this too is a legitimate, non-discriminatory reason for the difference in treatment.

Because the Town has provided legitimate, non-discriminatory reasons for its decisions, the burden shifts to Shaw to demonstrate that the Town's reasons were pretextual. Even looking at the facts in the light most favorable to her, Shaw has not done so.

Concerning Shaw's initial placement at pay grade 4.5, Shaw appears to argue that supervisor Wiepert's explanation for that decision—that it was part of a new hiring practice—was inconsistent with the placement of Stoelting at pay grade 5. The Court is not persuaded. A jury could not reasonably infer from the Town board's decision to place Stoelting at pay grade 5 that the Town intentionally discriminated against Shaw when it placed her at pay grade 4.5. The two actions took place six years apart, and by the time of Stoelting's hiring, two of the three board members had changed, as had the town supervisor and deputy supervisor. *See* Dkt. No. 11-10 at 2; Dkt. No. 11-13 at 2, Dkt. No. 13 at 11. It would be unreasonable to infer that members of the Town board discriminated against Shaw because, six years later, a different set of board members treated a new

male employee differently than her. *Cf. Kight v. Auto Zone, Inc.*, 494 F.3d 727, 734 (8th Cir. 2007) ("When employees have been terminated by different decisionmakers, it would be rare for them to be considered similarly situated because any difference in treatment may well be attributable to nondiscriminatory reasons."). In other words, any difference in treatment can reasonably be attributed to the passage of time and changing board composition, as opposed to an overarching discriminatory intent that persisted over six years and two different boards.

One could perhaps argue that supervisor Wiepert's contemporaneous explanation for the Town's pay decision—a new "hiring practice"—is inconsistent with the Town's present claim that it placed Shaw at pay grade 4.5 due to budgetary constraints. To the extent Shaw makes that claim, the Court disagrees. *See, e.g.*, *E.E.O.C. v Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (stating that a jury may infer pretext where the employer's explanation for its decision develops or changes over time); *see also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-47 (2d Cir. 2013). If anything, the two explanations are consistent: because the Town did not have the budget necessary to hire a Motor Equipment Operator in 2012, it changed its hiring practices so that a truck driver could be hired. Regardless, these facts do not present the sort of stark inconsistencies or contradictions from which one can reasonably infer pretext. *Compare Ethan Allen*, 44 F.3d at 120 (jury could reasonably infer pretext where employer initially told state investigators it discharged employee due to a decrease in available work, but when it was discovered that there was, in fact, sufficient work, employer then cited employee's "performance problems" as the reason), *with McDowell v. T-Mobile USA, Inc.*, No. 04-CV-2909, 2007 WL 2816194, at *16 (E.D.N.Y. Sept. 26, 2007) (pretext could not be reasonably

inferred where employer "did not completely backtrack in litigation from its original rationale" and "presented a generally consistent explanation for its actions").

For similar reasons, Shaw has not presented sufficient evidence to show that the Town's refusal to grant her an additional step increase was the product of sex discrimination. Indeed, under the employee handbook, Shaw "did not meet the time requirements to advance to the second step." Dkt. No. 13 at 22. To prove discrimination, Shaw again relies on the difference between her treatment and that of Stoelting. As discussed above, however, Stoelting's situation was materially distinguishable: different decisionmakers were involved in his hiring, and the extra step increase was based on the fact that he was hired only one week after the applicable cutoff date. By contrast, Shaw did not request an additional step increase because she was hired near the cutoff date, but because she believed it to be fair given the work she was already performing. A jury could not reasonably infer pretext under these circumstances.[2] *See, e.g.*, *Batson v. Glen Cove City Sch. Dist.*, No. 14-CV-3817, 2019 WL 590878, at *10 (E.D.N.Y. Jan. 7, 2019) (African-American plaintiff could not demonstrate pretext based on difference in treatment between her and Caucasian co-worker, where the "action taken against Plaintiff arose under different circumstances").

In sum, Shaw has failed to present sufficient facts from which a reasonable jury could infer that the Town's pay decisions were pretextual and discriminatory. Accordingly, Shaw cannot meet her burden, and summary judgment in the Town's favor is appropriate on the sex-discrimination claim. *See id.* at *11.

---

[2] This is not to say that Shaw's justification for a bonus step increase was unreasonable or that the Town acted equitably in denying her the bonus step increase; the Court merely concludes that one cannot infer a *discriminatory* motive from these circumstances.

11

**II.     Retaliation**

Title VII prohibits "retaliation against an employee who complains of an unlawful practice." *Bianchi v. Rochester City Sch. Dist.*, No. 16-CV-6840, 2019 WL 4750424, at *9 (W.D.N.Y. Sept. 30, 2019). To establish a *prima facie* case of retaliation, a plaintiff must show, among other things, that she "suffered a materially adverse employment action." *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014). "An adverse employment action for purposes of a retaliation claim is one that a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Bianchi*, 2019 WL 4750424, at *9. "Petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal brackets and quotation marks omitted). Thus, the "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Tepperwien v. Entergy Nuclear Ops., Inc.*, 663 F.3d 556, 568 (2d Cir. 2011).

In this case, Shaw has not provided sufficient evidence that she suffered any adverse employment action due to the alleged retaliation. Shaw appears to cite the following as adverse actions: (1) supervisor Johnston claimed Shaw had wrongly used personal leave to attend Town meetings and had incorrectly used bereavement leave; (2) the Town and supervisor Johnston claimed that Shaw had misrepresented her role in personal emails to others; and (3) supervisor Johnston told Shaw's co-workers about the lawsuit.

In the first two instances, supervisor Johnston brought to Shaw's attention that she was acting in ways contrary to town policies. While Shaw argues that she had acted sensibly and did not intend

12

to violate those policies, the Town appears to have had a reasonable basis for each of its allegations: Shaw *had* attended a Town meeting while on the clock; she *had* used bereavement leave in a manner contrary to Town policy; and she *had* signed her personal emails in a manner that suggested some official connection to the Highway Department. In any case, Shaw does not point to any tangible harm or injury resulting from these incidents. At her deposition, Shaw conceded that neither her job duties nor her pay has been affected since she raised her complaints, Dkt. No. 11-7 at 57, and although the Town claimed that she had misused personal and bereavement leave, it did not seek to dock Shaw any time or pay.³  *See* Dkt. No. 11-11 at 5.

At most, there is evidence that the Town and supervisor Johnston criticized and scolded Shaw on a few occasions following her backpay request. But "criticism of an employee," whether it is "part of training [or] necessary to allow employees to develop, improve and avoid discipline," is not an "adverse employment action." *Tepperwien*, 663 F.3d at 570; *cf. Ziyan Shi v. N.Y. Dep't of State, Division of Licensing Servs.*, 393 F. Supp. 3d 329, 338 (S.D.N.Y. 2019) (stating that a negative or critical evaluation "will not constitute an adverse employment action unless the evaluation is accompanied by other adverse consequences"). This is true even if, as Shaw claims, supervisor Johnston acted unprofessionally in addressing the issues with her. *See, e.g.*, Dkt. No. 13 at 9 (alleging that supervisor Johnston threw "an email across the table" and told Shaw that others "thought [she] was someone

---

³ Shaw claims that after learning she "could not use [work] time to attend the Town's organizational meeting," she "immediately revise[d] [her] time and used [her] own time to attend this meeting." Dkt. No. 13 at 24. Likewise, she offered to use personal time in lieu of bereavement leave once she learned of the Town's bereavement-leave policy. *Id.* at 9-10. Insofar as nothing in the record indicates that the Town asked or required her to take those steps—indeed, it ultimately permitted her to use such leave—any loss of personal time does not constitute an adverse action *caused by* the Town. *See Davis v. Ashcroft*, 355 F. Supp. 2d 330, 339 (D.D.C. 2005) (noting that, for purposes of a Title VII retaliation claim, the adverse action must be "caused by [the] employer").

important" due to her email signature). Courts have held that a simple lack of good manners or professionalism on the part of a supervisor is akin to the types of minor annoyances that do not constitute adverse actions. *Ziyan Shi*, 393 F. Supp. 3d at 338-39 (collecting cases).

Likewise, regarding the third alleged adverse action, Shaw has not shown that supervisor Johnston's disclosure of the lawsuit to her co-workers impacted her. To the contrary, she states that she has "maintain[ed] good working relationships with the whole crew" despite those actions. Dkt. No. 13 at 25. Furthermore, Shaw states that, outside of these incidents, she has not faced any continuing harassment by supervisor Johnston or the Town more generally. *See* Dkt. No. 11-7 at 59.

As a final matter, the Court notes that it has considered all of these incidents in the aggregate. *See Tepperwien*, 663 F.3d at 568 (stating that "[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct"). Ultimately, what Shaw alleges amounts to a few, discrete misunderstandings and workplace disputes that, even if not handled in the most professional manner, did not create a situation that would dissuade "a reasonable worker from making or supporting a charge of discrimination." *Bianchi*, 2019 WL 4750424, at *9.

The Court recognizes that Shaw feels she has been unfairly targeted and has been treated in an unprofessional and inequitable manner. *See* Dkt. No. 13 at 10, 25. But this Court cannot "second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory." *Johnson v. Cty. of Nassau*, 480 F. Supp. 2d 581, 594 (E.D.N.Y. 2007). Because Shaw has not presented sufficient evidence that she was subjected to sex discrimination or that she suffered adverse

employment actions in retaliation for her complaints, Shaw is not entitled to relief on any of her claims, and summary judgment is appropriate.

## CONCLUSION

For the reasons stated above, the Court recommends that Defendant Town of Porter's motion for summary judgment (Dkt. No. 11) be **GRANTED** and that Plaintiff Wendy F. Shaw's complaint (Dkt. No. 1) be **DISMISSED**.

A copy of this Report and Recommendation was sent by Chambers to Shaw at her current address.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation, in accordance with 28 USC § 636(b)(1), Fed. R. Civ. P. 72(b)(2) and WDNY Local Rule 72(b).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn*, 474 U.S. 140 (1985); *F.D.I.C. v. Hillcrest Associates*, 66 F.3d 566 (2d. Cir. 1995); *Wesolak v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The District Court on *de novo* review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge

in the first instance. *See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

SO ORDERED.

/s/ Hugh B. Scott
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: October 23, 2020